22, 1189, State of New York v. Raimondo. May it please the court, Steven Yanni for the appellants. Defendants agree that the best scientific information available includes new data showing that some are flounder have shifted dramatically north toward New York. Yet the rule they adopted to purportedly account for that shift states that it is not based on the new data. Despite having many ways to incorporate the new location data, the agency instead largely retained a 30-year-old formula based on where fish were brought ashore in the 1980s. In an abundant years only, it arbitrarily splits any surplus among states that are active in the fishery. By its own terms, this new allocation rule is not based on the best scientific information available as required by statute. On its face, you say? Yes, well, yes, the rule on its face states that it is not based on the biomass distribution, which all of us agree forms at least part of the best scientific information available and is the best scientific information available about the geography of the fishery. The agency or the MF whatever group did this has imperatives to balance many factors, not just where the fish are. Isn't that true? It is true that the agency has discretion to balance factors, but its discretion is also constrained by the language of the statute. And here, the statute requires that the agency's regulations shall be based upon the best scientific information available. But the only way the agency even purports to have accounted for the new location of the fish is its surplus formula. But when you look more closely at what that formula does, it's clear that the results are arbitrary and not connected to the location of the fish. So you talk about current fish location data, but is there a specific data set that incorporates that? I mean, I understand your argument is that the baseline data here is from the 80s and it's old, but it seems to me that there needs to be something sort of more formal than that to compare what is best versus it could be better. Sure, there are several data sets that are discussed in the record. The agency, in fact, considered incorporating one of those data sets, biomass distribution data collected by trawl surveys from the Department of Commerce. And it considered an alternative that would have adjusted the quotas based on the location data. And it has also done so in other analogous contexts. For example, for the black sea bass, which is also managed by the fishery service, the agency adopted a blended formula by which it calculates allocations based on both historical data and has a dynamic component to account for biomass distribution in the location of the fish. But here, when you look at what the surplus formula does, it evenly splits the fish in abundant years only among the active states, even though there's no data showing that the fish are evenly distributed along the coastline. And in fact, it doesn't even do what the agency says it does. The agency says that the surplus formula generally benefits northern states. But when you look more closely, states that are closer to the fish, such as Rhode Island, see their overall allocation decrease when the surplus formula is applied. And Maryland, which is in the southern region of the fishery, sees its allocation triple when the surplus formula is applied. That's because they consider other criteria beside where the fish are, right? Well, the- They consider the industry, the preexisting industry, the economics of the industry, and all the coastal states. Isn't that true? Isn't that another mandate that they have to consider? Yes, the agency does have to consider those other factors, but I will note that the factor is not worded in the same terms as National Standard 2. It says that the agency shall take into account the importance of fishery resources, which is not as stringent as the based-upon language in National Standard 2. But even as to National Standard 2, we're not saying the agency has no discretion. There's a lot of discretion the agency has. It can choose among competing data sets if it thinks some data is inaccurate, it can reject inaccurate data, and it can choose how precisely to incorporate the data into its formula. But what it can't do is simply set the best scientific data available aside. And that's what it did here when it adopted the surplus formula, which the agency expressly states was based on historical practice and fairness concerns and not science. Is that the only objection you have on the surplus distribution after the original allocations are made? Well, I think there are multiple problems with the surplus formula, another being that where there is no surplus, there is no accounting for where the new fish are at all. So that means if the coastline quota is at or near the 9.55 million pound threshold, all of the allocations are calculated by reference to the 1993 formula. And this is not just a theoretical possibility. In several of the years leading up to the adoption of the rule- Counsel, does the Commerce Department and all the agencies that work on these issues acknowledge where the biomass of flounder is? Do they acknowledge that it has moved north? They agree that it has moved north, but the solution that they adopted in response was not based on the fish location. It instead adopted this surplus formula, which for the reasons we explained doesn't bear any meaningful connection to the location of the flounder. But you will have to admit that fish location is not the only factor that they have to consider. They have to consider the economics of all the states and equity to the states that come to New York, get the fish, bring it back, and then send it to you, New York, which seems crazy to me, but I know. Well, we're certainly not saying that they have to rely exclusively on the location data. Under the act, they're entitled to look at other kinds of data, including economic data, but even the agency's own regulations say that the information that it considers, the best available science, has to be pertinent to the questions under consideration and representative of the fishery being managed. So here, the question under consideration was how to adjust the formula in light of the fact that the fish have moved. So it was essential that the agency base its rule and meaningful part on the actual location of the fish. But instead, it relied only on flawed 1980s landings data, which the states had resolved to improve from the start because the data collection efforts weren't very strong. And that data does not serve its stated purpose any longer. The purpose of that data was to serve as a proxy for state-level effort and interest in the fishery without any management controls. But that ignores that the fishery has fundamentally changed since the adoption of the 1992 rule. There's increased demand now based on where the fish are located. I want to interrupt you to ask a question about the EIS, which said that they have to provide some economic protections to states with higher dependence on the summer flounder fishery. Is that science? I mean, would you argue that that was not based on any science? Well, I think the agency in choosing how to address the other factors would have to consider data that is accurate based on economics, et cetera. But we're not saying the agency can't do that. We're not saying they can't have a rule meaningfully based on the location of the fish and adjust it to account for other interests. That's, in fact, what the agency has done in other contexts. As I stated before with the Black Sea Bass rule, the agency both considered the historical landings to account for that and then adjusted the formula based on the location of the fish. And the current rule as it stands causes many different problems. And as we've noted in our brief, it also violates other national standards, including that it doesn't sufficiently consider efficiency. As the fishery currently stands, the states that are farthest away from the center of the fishery have the largest quotas and they have to travel hundreds of miles to catch fish near New York, go all the way back to their home states to land those fish, and in many cases, as Judge Pooler referenced, then ship those fish back to New York, which has among the highest demand for the fish. It doesn't make sense to me, but I'm not commerce. We agree, Your Honor. That it doesn't make sense. We agree that it doesn't make sense and that the agency didn't sufficiently consider it. Well, maybe the governor will tell us why it makes sense. Sorry. Thank you, Counselor. Thank you. Good morning, Your Honors. May it please the court. Lucas Issacharoff for the United States Attorney's Office on behalf of the government. The Magnuson-Stevens Act sets forth 10 national standards for management of fishery resources. The act calls for significant agency expertise and discretion both in applying each of the standards and in balancing their at times competing demands. Here, the National Marine Fisheries Service engaged in an extensive process of consultation, deliberation, and rulemaking. The government sought to manage the viability of the fishery while balancing the reliance interests of eastern seaboard fishing communities with acknowledged shifts in the location of the summer flounder population. How did they take account of the acknowledged shift in the biomass of flounder? I don't see that they did that. Your Honor, as the agency noted in its record of decision, which is page 544 of the joint appendix, that the surplus allocation formula does generally shift quota from states at the southern end of the summer flounder distribution, North Carolina, Virginia, and New Jersey, an increased allocation for many northern states, including New York. But what about in years where there was no surplus? How did they take account of the biomass shifting from south to north? They noted the presence of the biomass, but they emphasized, and the record is clear, that they placed a strong emphasis on preserving the reliance interests of fishing communities, especially in years where everybody was going to take a hit because the quota was lower than the 9.55 million pound threshold. So they don't really take advantage of that particular scientific fact that the fish have moved north. They don't make it a determinative factor, Your Honor, and I think it's important to- Shouldn't they have made it a determinative factor? No, Your Honor. The Madison-Steven, the 10 national standards, none of them state that one of the standards to be applied is that the fishing rights should be allocated geographically proximate to the fishery location. The fish location data is certainly relevant insofar as it affects things like fairness and equity, as it affects potentially efficiency or cost factors, but there's no statutory mandate that says that the allocation of fishing rights must be geographically proximate. I think it's instructive here to look at national standard four, which states that where it is necessary to allocate or assign fishing privileges among various United States fishermen, such allocation should be fair and equitable, reasonably calculated to promote conservation, and carried out in a manner such that no particular individual corporation or other entity acquires an excessive share of such privileges. Okay, so I've read that before, as you can imagine. What about the incident or the problem that counsel mentioned, where North Carolina fisher persons come to New York, capture the fish, bring it back to North Carolina, who then sells it to New York? Is that fair? I don't think, I think that there is an argument that that is inefficient in some respects, Your Honor. I don't think it's unfair. I don't think it's unfair to say that North Carolina and Virginia fishermen who have invested in large offshore fleets that are designed and adapted to efficiently and economically fish for summer flounder populations in the offshore waters during the winter fishing season, that that investment should not be stripped away because of a shift in the biomass that they have no control over. Is that the explanation for why their tonnage is larger, and that they tend to have the larger ships located in North Carolina, Virginia, because they more significantly fish in the winter in the colder weather, and so therefore they're traveling further, not necessarily for the summer catch alone, but for the winter catch also? Just to be clear, Your Honor, summer flounder is a species designation, and summer flounder is fished in both the summer and in both the winter, in all seasons. The geographic distribution of where the fish is caught does shift seasonally, such that in the winter months, it is offshore in deeper waters, and that's where the North Carolina and Virginia fleets do traditionally fish, and then in the warmer summer months, it comes further inshore, which is traditionally where New York has a larger small to mid-size fishing fleets. So if the allocation were fairer to New York, I'll use that word, put it in quotes, don't you think New York would develop the same kind of fishing industry that has been in North Carolina only because of past allocations? It is possible that it, certainly if fishing privileges were reallocated more dramatically in New York's favor, it is certainly possible. And New York State requested,  New York State requested a fairer, what they called a fairer allocation. I think they requested a larger allocation, which they think would be fairer, but I think we're inevitably, once you're assigning privileges, the allocation is going to create winners and losers. I think it's instructive when you're talking about what constitutes a fair and equitable distribution to look at the statutory definition of the fishing communities whose interests have to be taken into account. And so if you look at 16 U.S.C. 1802, paragraph 17, the fishing community is a community which is substantially dependent on or substantially engaged in the harvest in fishing. And so that speaks in terms of communities that exist now. There are North Carolina and Virginia fishing captains who have invested in large vessels specifically suited to the summer flounder fishing. There could be more fishing activity in the future in New York if privileges were assigned that way, but you'd be privileging a hypothetical future fishing community over the present existing. Don't you think it would have been wiser to alert the fishing communities in North Carolina and Virginia that the fish are moving away and you should prepare to limit the size of your fleets? They could have done that with a slight difference in allocation. And that would have been fairer to the states where the fish are. Your Honor, I think that North Carolina and Virginia certainly have been aware of the shifting biomass, the location of fishing, the fleets go where the fish are, and the fishing activity has been slowly shifting north. What you didn't answer me, and you could have and should have, is that we don't get the right to make other decisions. What we're judging is whether the agency based its own record evidence before it and rationally followed what was in front of them. And so you are arguing that they did that, that it was a rational review of the record, and that we have no business getting into the details of how they balanced all the factors. Yes, Your Honor. Your Honor, correct, referencing the standard of review, and as the Supreme Court has said, this is a narrow standard of review. A court is not to substitute its judgment for that of the agency, but instead to assess only whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. And I think the standard afforded to agencies under State Farm, under the APA, is particularly high when we're dealing with matters of scientific or technical expertise. So the thrust of the state's argument is national standard two, and so what is best, what best scientific information available, what does best mean? It seems like, you know, you're relying sort of on, you know, trust us, there's a lot of factors here, and, you know, we'll balance them, it's our discretion. And maybe that's right, but I'm just wondering if there's something more precise than that. So I think there's no dispute that the best scientific evidence on location data indicates that there has been a northward shift. And so if you look at other standard two cases, what's our- That means that reliance on the 1993 data set does not account for that, so- The reliance on the 1993 data set is about landings, is about landings data, rather than, which is intensity of fishing activity by fishing communities, rather than location. So one instructive point to look at is that between 1980 and 1999, about 67, slightly more than two-thirds of the, or 67% of the biomass was located north of the Hudson Valley Canyon, or the New York, New Jersey border. So already in the 1980s, more than two-thirds of the, two-thirds of the biomass was located in what we now consider northern waters. But more than two-thirds of the landings activity took place in states south of that. So- Why wouldn't the landing data from 2010 be more relevant to figuring out the economic activity with regard to the fishery? By using something that's almost, that's 30 years old, you're measuring an industry a generation ago, as opposed, and so you're assuming that Virginia and North Carolina are landing a lot of fish, and so therefore their fleets are larger, and you measure the size of the boats and stuff. But wouldn't you be more interested in seeing the vibrancy of the fishery, the fishing industry, in a closer period of time to the period of time in which you're gonna allow the fishing? The agency did examine the more recent landings data. It noted which is roughly the same as the 1980-1989 landings data. That is, of course, constrained by the fact that the fishing privileges have been allocated on the basis of that earlier. So the landings data hasn't changed from 1993 to today. Because the allocations have always been reflective of the earlier economic activity. Yes, Your Honor. I see that my time is up, and if the court has no further questions, we're happy to rest. Well, I have some objection, generally, to calling economic and social data scientific in the way that we know where the biomass is, and I think the agency equated social science data together with science data. Can you comment on that? Well, the... I mean, what I would call hard and soft data. I think that the statutory language doesn't support a distinction or a preference of biological data over social data. So what National Standard Eight says is that the agency must take into account the importance of fishery resources to fishing communities by utilizing economic and social data that meets the requirements of paragraph two. I know that. I mean, I know that, but I just feel it doesn't have the same quality as real, as hard data of where the fish are. I think that if you look at the regulations implementing, which don't have the force of law, but as New York acknowledges, are entitled to skim more deference, they state that the agency should take into account economic and social data. The environmental impact statement is replete with information about pricing, price elasticity of demand in different markets, but also qualitative data. So I don't think that there is necessarily sort of a tiering of data. And I think that's an important point to come back to with this idea that because fish location data is in some sense more scientific or more recent, it is the most important data. It is the best fish location data, but it is not necessarily better than landing. It is not necessarily more important than landings data. It is not necessarily more important than economic or social data about the reliance interests of fishing communities. Those factors are factors for the agency to weigh. And I would also just finally note that efficiency is not just about how close are you, how close is the landing to where the fish are caught. They're also about whether resources such as large fishing fleets developed by Virginia and North Carolina are being efficiently utilized. If their quota was dramatically cut, those ships would not be able to efficiently utilize their capacity as the agency noted. So efficiency, and this is part of the reason for deference to the agency here, that it's very intuitively obvious to say, well, give the fishing privileges to whoever's closer. But one of the reasons that Delaware does not, which is significantly closer than North Carolina or Virginia to the biomass center point, is that Delaware has no historical fishing community. Wouldn't make sense to create an entirely new fishing industry in Delaware and scupper that, which already exists in North Carolina and Virginia. So because the agency properly considered the necessary factors, including the biomass location data, but also the other factors that it's required to take into account, and because it made a decision that was within its considerable discretion, we would urge the court to affirm the court below and uphold the agency's decision. Thank you. Thank you, counsel. Courtier Rebo. New York acknowledges that the agency could consider state historical participation in the fishery, but the problem here, as the agency stated at JA-495, is that historical participation was always the priority throughout this process, and incorporating modern data was viewed only as an option. But that runs contrary to the statute. The language based upon requires incorporating the scientific information in meaningful part. And this is supported by the text, the context, and the case law that we've cited. The best scientific information has to be a principal component or a fundamental ingredient of the rule, and it's not here. Now, Judge Park, you asked, how do we know what the best scientific information available is? Well, I would suggest looking at the agency's regulations on this point. The agency says that the best scientific information has to be representative of the fishery. It has to be timely. It cannot be static. But the 1993 data on which the agency relies is the very definition of static. It perpetuates landings year after year, and that's part of what makes this scheme fundamentally unfair, because New York is not able to demonstrate its increased demand and capacity to take advantage of the resources that are now closer to its coast. Now, counsel said that we have to look at the fact that North Carolina and Virginia have larger ships, and if their quotas go down, that means perhaps they cannot utilize every aspect of the infrastructure, but that's simply a recipe for perpetuating the current allocations forever. Under that logic, no matter how far the fish has moved, we would always have to keep the allocations the same, but that's not what's required by the, that's not what the Magnuson-Stevens Act requires. I would tell you- If New York, if you are right, and New York, suddenly the allocation was shifted and New York then spent hundreds of millions of dollars developing a fishery based upon the seasonal flounder, and then suddenly the fish decided to move south again, would New York be willing to give up its share recognizing that the money that had been expended in purchasing the boats and the livelihoods that had been supported for all those years, they'd give up their percentage share because the fish had moved south? I doubt it. I think the benefit of the statute is that the agency gets to consider all of those factors. It gets to- Well, that's exactly what, there are other factors to consider, are there not, other than just where the fish are? There are, but our fundamental disagreement is that the agency did not properly account for that factor. It could have accounted for that in a number of ways by incorporating it somehow into its formula. How do you measure, how do they end up appropriately accounting for it? By increasing New York's share by 10%, by 20%, by 30%? How do you account for that? What's the grid that we're supposed to use? We're not advocating for a particular result or saying that the agency had to adopt a particular allocation for- Well, it's an abuse of discretion standard, isn't it? Well- So we have to find, we have to find that somehow they made a mistake. Well, I think the fundamental mistake here is that they did not base their adjustment, which they said was meant to account for where the fish have moved, based on where the fish are located. Instead, it creates anomalous results whereby some northern states see their quotas go down, some southern states see their quotas go up, and the agency has provided no explanation for how these anomalous results are based on the available science. And I would just conclude by saying there's a fundamental mismatch here between the agency's stated purpose, which was to adjust the allocations to reflect the current fish location and the solution they adopted, which was to arbitrarily split surplus quota in abundant years. And for these reasons, we respectfully ask the court to reverse. Thank you. Thank you, counsel. Thank you both. We'll take the case under advisement. That concludes our arguments for today. So I'll ask the court and deputy to adjourn. Court stands adjourned.